**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| NASREEN BEGUM, *on behalf of herself and all similarly situated individuals*, ) ) ) | |
| Plaintiff, ) ) | Civil Action No. 1:24-cv-893 |
| v. ) ) | |
| FAIR COLLECTIONS & OUTSOURCING, INC., ) ) | |
| Defendant. ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Nasreen Begum, on behalf of herself and all other similarly situated individuals, files this Class Action Complaint against Defendant Fair Collection & Outsourcing, Inc. ("FCO" or "Defendant"). In support, Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action for actual and statutory damages, costs, and attorneys' fees for FCO's violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and actual, statutory, and punitive damages, costs and fees for its violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*

2. Congress enacted the FDCPA to "eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692.

3. Congress recognized that abusive debt collection practices cause harm to consumers by contributing "to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." 15 U.S.C. § 1692(a).

4.     The FDCPA, therefore, "is a strict liability statute, and debt collectors whose conduct falls short of its requirements are liable irrespective of their intentions." *Ruth v. Triumph P'ships*, 577 F.3d 790, 805 (7th Cir. 2009).

5.     Ms. Begum was forced to move out of her longtime apartment at West Springfield Terrace in Springfield, Virginia after a murder in the neighboring apartment caused her to experience severe psychological trauma.  With the help of her children, Ms. Begum provided notice to her landlord of the early termination of her lease.  Although ending her lease early, Ms. Begum did not elect to pay the optional $3,968.00 early termination or "buy-out" fee under the terms of her lease, requiring her landlord to instead seek damages, if any, that it incurred until it could relet the apartment.  Her landlord did not seek any damages, however, and, upon information and belief, was able to quickly relet the apartment to a new tenant.

6.     Instead of seeking its actual damages in court, Ms. Begum's landlord referred her account to Defendant FCO for debt collection, and FCO subsequently sought to collect the almost $4,000 early termination fee from Ms. Begum.  But this amount was not owed under the terms of Ms. Begum's lease or any other provision of law, and FCO's attempted (and eventual) collection of this amount was unlawful under the FDCPA.

7.     Adding to its harmful conduct, FCO also reported the inaccurate amount of past-due debt on Ms. Begum's credit reports.  When she disputed these amounts by pointing out the terms of her lease, FCO ignored those terms.  It instead chose to perform a perfunctory "review" of its internal systems and reiterated the same inaccurate information back to the credit bureaus. As a result, her credit score plummeted, and she was unable to complete a much-needed refinancing of her other debts.  Facing the financial pressure of FCO's false and derogatory credit reporting, Ms. Begum was forced to pay FCO for the debt she did not owe.

8.      Ms. Begum is not alone in this practice.  As discovery will confirm, FCO collects similar termination fees from thousands of consumers nationwide that are not required under the express terms of the consumers' pro forma lease agreements.  As a result, Ms. Begum and others have made thousands in unnecessary payments and have suffered other damages from FCO's attempted collection and collection of these unlawful debts.  FCO has in turn aided landlords across the country in collecting termination fees in lieu of the landlords establishing their actual damages in court, which are often far less than the termination fees FCO collects.

9.      Faced with this widespread unfair and deceptive conduct, Ms. Begum brings this case under the FDCPA on behalf of herself and a class of similarly situated consumers.  She also brings individual claims under the FCRA for FCO's failure to reasonably investigate and respond to her disputes regarding its inaccurate reporting.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. § 1331, 15 U.S.C. § 1692k(d), and 15 U.S.C. § 1681(p).

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and Division.

## PARTIES

12.     Ms. Begum is a natural person residing in this District and Division.  She is a "consumer" as defined by the FDCPA, 15 U.S.C. § 1692a.  She is also a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

13.     FCO is a Maryland corporation with its principal place of business in Laurel, Maryland.  FCO is a "debt collector" as defined by the FDCPA, including because it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or

due another—for example, Ms. Begum's landlord and the other landlords of the putative class members. 15 U.S.C. § 1692a. FCO is also a "furnisher" as governed by the FCRA.

14. Additionally, FCO is a debt collector as defined by the FDCPA because its principal purpose as a business is the collection of debts, and it uses instrumentalities of interstate commerce including the mail to carry out that purpose. 15 U.S.C. § 1692a. FCO's website states that it is "a leading national rental housing debt collections agency . . . ."[1] FCO also claims to "manage multiple shifts of professional debt collectors in omni-channel communication centers contacting debtors across the United States."[2] FCO does not advertise or describe any business purposes other than the collection of debts.

## FACTS

### *Debt Collectors Cannot Collect Debts*
### *Not Expressly Authorized by the Agreement Creating Them*

15. The FDCPA provides that debt collectors "may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

16. Among the "unfair or unconscionable" conduct that the FDCPA prohibits is "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* § 1692f(1).

17. Interpreting that provision, the Fourth Circuit recently ruled that debt collectors cannot lawfully collect payment convenience fees that were not set forth in the agreement that otherwise created the subject debt (*e.g.*, a lease). *See Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370 (4th Cir. 2022) ("Nothing we have said prevents Carrington from extending this

---

[1] https://www.fco.com/Home.

[2] https://www.fco.com/About.

payment option to consumers. If it does so, however, it must do so without the imposition of a statutorily prohibited convenience fee.").

18. The Consumer Financial Protection Bureau has since confirmed the same. CFPB Advisory Opinion, *Debt Collection Practices (Regulation F); Pay-to-Pay Fees* (June 2022), *available at* https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_convenienc efees_advisory-opinion_2022-06.pdf ("The Consumer Financial Protection Bureau (CFPB) issues this advisory opinion to affirm that [§ 1692f] prohibits debt collectors from collecting pay-to-pay or 'convenience' fees, such as fees imposed for making a payment online or by phone, when those fees are not expressly authorized by the agreement creating the debt or expressly authorized by law.").

19. Despite the clear law and guidance on this issue, FCO has continued to collect and attempt to collect convenience fees and other analogous fees such as early termination charges that are not mandated by consumers' lease agreements. This is precisely what occurred with Ms. Begum here.

### *Plaintiff's Lease*

20. Since 2017, Ms. Begum has rented an apartment in the West Springfield Terrace community. Her most recent lease had a lease term of June 2, 2023 to June 2, 2024. Her landlord under the lease was West Springfield Terrace Gardens, LLC ("Landlord").

21. Ms. Begum's lease was a form lease prepared by the National Apartment Association for use by landlords across the country.

22. The lease included a "Lease Contract Buy-Out Agreement," also prepared by the National Apartment Association for use by landlords nationwide, which gave Ms. Begum "the right to buy out of your Lease Contract early." The Buy-Out Agreement specified that to exercise the buy-out right, Ms. Begum had to satisfy certain conditions, including providing written notice

of her intent to buy-out at least 60 days prior to the early termination date and paying a "buy-out fee" (also known as an "early termination fee" or "termination fee") of $3,968.00. If Ms. Begum elected to buy out her lease, she had 30 days after providing the buy-out notice to pay the buy-out fee.

23. The buy-out fee was not an obligation under the lease, but an optional right that Ms. Begum could exercise if she wanted to avoid potential payments for missed rental payments and other damages incurred by the Landlord between her early termination of the lease and the reletting of the apartment.

24. Ms. Begum thus had two options under her lease: (i) pay the buy-out fee and satisfy the other conditions of the Buy-Out Agreement to effectively terminate her lease with no additional obligations; or (ii) remain responsible under the terms of the lease until her Landlord rented the apartment to a new tenant.

### *Plaintiff's Early Termination*

25. For years, Ms. Begum, who is elderly, made timely rental payments on her lease with the support of her children.

26. Unfortunately, there was a murder in a neighboring apartment at the West Springfield Terrace community.

27. After learning of this horrific event, Ms. Begum began to experience severe psychological and emotional trauma, including panic attacks, anxiety, depression, sleeplessness, paranoia, and a fear of leaving her apartment.

28. Faced with her worsening emotional distress, Ms. Begum and her sons agreed that she should move to a new apartment. Ms. Begum thus provided 60 days' notice to her Landlord

of her intent to vacate the apartment. She then vacated the apartment in October 2023, within the 60-day notice period, while remaining current on her rent.

29.     Ms. Begum did not provide notice of her intent to buy out the lease under the Buy-Out Agreement, nor did she pay the $3,698.00 buy-out fee within the required period. She elected instead to incur whatever damages, if any, the Landlord was able to prove it suffered before it was able to relet the apartment.

30.     Ms. Begum was thus not obligated to pay the buy-out fee, and her Landlord was required to seek damages, if any, in court.

31.     Shortly after Ms. Begum moved out, her Landlord rented her apartment to a new tenant. The Landlord never sued Ms. Begum for damages from her early termination of the lease.

32.     Instead, the Landlord referred Ms. Begum's account to FCO to collect alleged amounts owed under the lease, including the $3,968.00 buy-out fee.

33.     The Landlord, of course, had no basis for pursuing the buy-out fee (which was the equivalent of two months' rent) under the Buy-Out Agreement because that right was never exercised by Plaintiff, who did not pay the fee or even provide notice of her intent to buy out the lease under the Agreement. The Landlord was instead required to seek a judgment for any actual damages that it could establish in court after also showing that it mitigated those damages.

### FCO's Debt Collection

34.     Rather than seek judgments for its alleged damages, Ms. Begum's Landlord routinely hires FCO to pursue early termination fees and other debts.

35.     After Ms. Begum's account was referred to FCO, in the spring of 2024, it sent her a letter demanding payment of $4,607.14.

36.     Ms. Begum responded to FCO's communication requesting validation of the demanded amounts.  In response, in April 2024, FCO sent Ms. Begum a verification letter that claimed she owed her Landlord the $3,698.00 "termination fee"—i.e., the "buy-out fee"—under the Buy-Out Agreement.

37.     FCO's representations in its debt collection communications were false because Ms. Begum did not—and does not—owe the buy-out fee.

38.     Indeed, the "buy-out" or "termination" fee was never outstanding as it was an optional fee designed to avoid the traditional damages a landlord can pursue in the event of early termination; damages that Ms. Begum elected to incur in lieu of paying the fee.

39.     FCO's attempts to collect and collection of the "buy-out" or "termination" fee on behalf of the Landlord was therefore in violation of the FDCPA, which expressly prohibits the attempted collection or collection of debts that are not expressly authorized by law or the terms of the relevant contract.

40.     As a result of FCO's collection efforts, Ms. Begum suffered emotional distress from FCO's false claims about the amounts she allegedly owed.  She was also forced to pay the false amounts to FCO.

### FCO's Inaccurate Credit Reporting and Refusal to Reasonably Investigate Ms. Begum's Disputes

41.     As part of its debt collection efforts, FCO reported the inaccurate and misleading amounts allegedly owed by Ms. Begum to all three credit reporting bureaus, who included FCO's inaccurate information in Ms. Begum's credit files.

42.     As a result of this inaccurate reporting, Ms. Begum's credit score plummeted, preventing her from obtaining much needed refinancing of her other debt obligations.

43. Faced with the direct financial harm caused by FCO's reporting, Ms. Begum was forced to pay the full amount that FCO claimed she owed, including the buy-out fee, in hopes of reducing the harm from FCO's inaccurate reporting, though FCO continued to report the full amount as a collected debt even with this payment.

44. On April 17, 2024, Ms. Begum also sent written dispute letters to Equifax, Experian, and Trans Union. In those letters, she explained that the amount reported by FCO as past-due included a "termination fee" that she did not owe under the terms of her lease.

45. Upon information and belief, Equifax, Experian, and Trans Union forwarded Ms. Begum's disputes to FCO.

46. FCO understood Ms. Begum's disputes.

47. Upon information and belief, FCO did not review the lease agreement or other correspondence with Ms. Begum to determine whether it mistakenly reported amounts that she did not in fact owe under the terms of the lease.

48. Instead, FCO simply performed a cursory review of the information in its internal system and reiterated the inaccurate information back to the credit reporting bureaus who then parroted the information on Ms. Begum's credit reports.

49. Consequently, Ms. Begum's credit reports continued to show the inaccurate amount of past-due debt allegedly owed by Ms. Begum to her Landlord.

50. On May 7, 2024, Ms. Begum sent follow-up disputes to Equifax, Experian, and Trans Union. She again explained that the amounts reported by FCO as past due were inaccurate because they included fees that she was not required to pay under her lease. Ms. Begum enclosed a copy of the lease with her dispute letters.

51.     Upon information and belief, Equifax, Experian, and Trans Union forwarded Ms. Begum's follow-up disputes to FCO.

52.     FCO understood Ms. Begum's follow-up disputes.

53.     Upon information and belief, FCO did not review the lease agreement or other correspondence with Ms. Begum to determine whether it mistakenly reported amounts that she did not in fact owe under the terms of the lease.

54.     Instead, FCO simply performed a cursory review of the information in its internal system and reiterated the inaccurate information back to the credit reporting bureaus who then parroted the information on Ms. Begum's credit reports.

55.     Consequently, Ms. Begum's credit reports continued to show the inaccurate amount of past-due debt allegedly owed by Ms. Begum to her Landlord.

56.     As a result of FCO's failure to reasonably investigate and correct its inaccurate reporting, Ms. Begum's credit scores from all three bureaus plummeted, which prevented her from refinancing other debt obligations that she needed to refinance to avoid further financial difficulties.  Ms. Begum also suffered and continues to suffer emotional damages and distress from FCO's inaccurate reporting.

### *FCO's Willfulness under the FCRA*

57.     FCO's processing of consumer disputes was willful and carried out in reckless disregard for a consumer's rights under the FCRA.  In fact, FCO acted in accordance with its intended procedures.  In addition, FCO prioritizes processing disputes quickly over making sure that the disputes are investigated thoroughly and accurately.

58.     In addition, the willfulness of FCO's FCRA violations can be established by, for example:

a. Congress enacted the FCRA in 1970, and FCO has had over 50 years to become compliant;

b. FCO is a corporation with access to legal advice through its own general counsel and outside litigation counsel. Yet, there is not contemporaneous evidence that FCO determined that its conduct was lawful;

c. FCO knew, or had reason to know, that its conduct was inconsistent with the FCRA's plain language, regulatory guidance, and the relevant case law;

d. FCO voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading of the statute that was merely careless;

e. FCO's FCRA violations were repeated and systematic;

f. FCO had substantial documentation available to it that apprised it of its duties under the FCRA but still chose not to comply with the statute; and

g. FCO had notice of its defective dispute processing procedures through internal audits and litigation but chose not to meaningfully change its policies and procedures to comply with the FCRA.

### COUNT ONE:
### VIOLATION OF FDCPA, 15 U.S.C. § 1692f
### (Class Claim – "Buy-Out" or "Termination" Fee)

59. Plaintiff incorporates each of the preceding allegations.

60. Under Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of the following class of which she is a putative class member:

> All persons: (1) who were or are tenants of properties subject to a lease with a "Lease Contract Buy Out Agreement" prepared by the National Apartment Association; and (2) who were contacted by FCO for payment of a "buy-out fee" or "termination fee" during the one-year period prior to the filing of this Complaint.

61.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The class members' names and addresses can be identified through FCO's internal business records, and the class members may be notified of the pendency of this action by published or mailed notice

62.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between them. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether FCO is a debt collector; (2) whether FCO violated § 1692f of the FDCPA by attempting to collect early termination fees that were not provided for in the National Apartment Association's form lease(s) or other agreements; and (3) the appropriate amount of statutory damages given the frequency and persistence of FCO's violations of § 1692f, the nature of FCO's violations, and the extent to which FCO's violations were intentional.

63.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

64.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate class representatives because her interests coincide with, and are not antagonistic to, the putative class members' interests. Plaintiff has retained experienced and competent counsel; she intends to continue to prosecute the action vigorously; she and her counsel will fairly and adequately protect the interests of the members of the class; and she and her counsel have no interest that might cause them to not vigorously pursue this action.

65. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even class members could afford it, individual litigation would be an unnecessary burden on the Court. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by FCO's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

66. FCO violated § 1692f by attempting to collect and collecting "buy-out" or "termination" fees from Plaintiff and the putative class members that were not provided for under the terms of the putative class members' pro forma "Lease Contract Buy-Out Agreement."

67. Upon information and belief, as a standard practice, FCO collects early termination fees on behalf of landlords even though no basis exists for such fees under the terms of the putative class members' leases.

68. Upon information and belief, FCO's conduct is a part of a broader practice of frequent and persistent noncompliance with § 1692f.

69. Plaintiff and the putative class members suffered actual damages from FCO's violations of § 1692f, including but not limited to the payment of unlawful amounts and emotional distress.

70.     Due to FCO's violations of § 1692f, Plaintiff is entitled, individually and on behalf of the class, to her actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.

## COUNT TWO:
## VIOLATION OF FDCPA, 15 U.S.C. § 1692e
### (Individual Claim)

71.     Plaintiff incorporates each of the preceding allegations.

72.     FCO violated § 1692e by falsely representing in its collection letters that Plaintiff owed a termination fee to her Landlord.

73.     FCO falsely stated that Plaintiff owed amounts that she did not.

74.     Upon information and belief, FCO's conduct is a part of a broader practice of frequent and persistent noncompliance with § 1692e.

75.     Plaintiff suffered actual damages as a result of FCO's violations of § 1692e.

76.     Due to FCO's violations of § 1692e, Plaintiff is entitled to her actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.

## COUNT THREE:
## VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(A)
### (Individual Claim)

77.     Plaintiff incorporates each of the preceding allegations.

78.     On one or more occasion within the past two years, FCO violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate Ms. Begum's disputes.

79.     When Ms. Begum disputed FCO's inaccurate reporting with the credit bureaus, FCO used a dispute system named "e-Oscar," which is an automated system that the consumer-reporting agencies have developed to quickly transmit disputes to furnishers.

80.     E-Oscar is an automated system, and the procedures used by the credit reporting agencies are systematic and uniform.

81.     E-Oscar's dispute processing is systemic and uniform: when the credit reporting agencies receive consumer disputes, they (usually via an outsourced vendor) translate each dispute into an automated consumer dispute verification ("ACDV") form.

82.     Upon information and belief, the ACDV form is way that FCO has elected to receive consumer disputes under 15 U.S.C. § 1681i(a).

83.     Upon information and belief, the credit reporting agencies forwarded Ms. Begum's disputes to FCO by ACDVs.

84.     FCO understood the nature of Ms. Begum's disputes when it received the ACDV forms.

85.     Ms. Begum's disputes were bona fide as the account reported inaccurate derogatory information.

86.     Upon information and belief, when FCO received the ACDV form containing Ms. Begum's disputes, it followed a standard and systematically unlawful process where it only reviewed its own internal computer screen for the account and repeated back the same information to the ACDV system that was previously reported to the credit reporting agency.

87.     Upon information and belief, when FCO receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether there is information already in its computer system that would demonstrate the disputed information is misleading or inaccurate.

88.     Because of FCO's violation of 15 U.S.C. § 1681s-2(b)(1)(A), Ms. Begum suffered actual damages, including a reduced credit score, the inability to obtain refinanced credit, reputational damage, embarrassment, humiliation, stress, and other emotional distress.

89.     FCO's conduct in violating 15 U.S.C. § 1681s-2(b)(1)(A) was willful, rendering it liable to Ms. Begum for punitive damages under 15 U.S.C. § 1681n.  In the alternative, FCO was negligent, entitling Ms. Begum to recovery under 15 U.S.C. § 1681o.

## COUNT FOUR:
### VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(B)
### (Individual Claim)

90.     Plaintiff incorporates the preceding allegations.

91.     On one or more occasion within the past two years, FCO violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the credit reporting agencies.

92.     As Ms. Begum detailed in the previous Count, FCO has elected to use the e-Oscar system for its FCRA disputes from the consumer reporting agencies.

93.     When it received the ACDV forms from the credit-reporting agencies, FCO did not review any of the information that Ms. Begum included in her dispute, which demonstrated that FCO's reporting of the amounts allegedly owed to her Landlord was inaccurate.

94.     If FCO had reviewed this information, it would have known that its previous reporting was incorrect and needed to be updated.

95.     FCO also ignored the other information that the consumer-reporting agencies provided on Ms. Begum's disputes, including the two-digit dispute code that the agencies listed on the ACDV form.

96.     FCO knew the meaning of the dispute codes used by the consumer-reporting agencies in e-Oscar.

97.     FCO does not contend that the ACDV system is an inadequate means to receive FCRA disputes from the consumer-reporting agencies.

98.    FCO understood Ms. Begum's disputes and that she was disputing that she owed the "termination" fee, as she was not obligated to pay that fee under the terms of her lease.

99.    Despite this, FCO did not update its incorrect and misleading reporting regarding the past-due amounts and continued to inaccurately attribute the full amount to Ms. Begum.

100.    Ms. Begum's disputes were bona fide as the account reported inaccurate derogatory information.

101.    Because of FCO's 15 U.S.C. § 1681s-2(b)(1)(B) violations, Ms. Begum suffered actual damages, including a decreased credit score, damage to reputation, embarrassment, humiliation, and other emotional distress.

102.    FCO's violations of 15 U.S.C. § 1681s-2(b)(1)(B) were willful, rendering it liable for damages under 15 U.S.C. § 1681n.

103.    In the alternative, FCO was negligent, entitling Ms. Begum to recover damages under 15 U.S.C. § 1681o.

## COUNT FIVE:
### VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(C) and (D)
### (Individual Claim)

104.    Plaintiff incorporates the preceding allegations.

105.    On one or more occasion within the past two years, FCO violated 15 U.S.C. §§ 1681s-2(b)(1)(C) and (D) by publishing its representations within Ms. Begum's credit files without also including any notation at all that the account was disputed and by failing to correctly report results of an accurate investigation to each credit reporting agency.

106.    For example, FCO failed to add the "XB" or "XC" code to the CCC (Compliance Condition Code) field of at least one of the ACDV dispute forms when it responded to the credit reporting agencies, which would have indicated that the account was disputed.

107.    In addition, FCO failed to add any other notation that Ms. Begum's account was disputed.

108.    Furthermore, FCO knew that Ms. Begum disputed the subject account through her direct and written dispute letters to the credit reporting agencies and to FCO itself.

109.    Ms. Begum's disputes were bona fide as the account reported inaccurate derogatory information.

110.    Because of FCO's violations of 15 U.S.C. § 1681s-2(b)(1)(C) and (D), Ms. Begum suffered concrete and particularized harm, including but not limited to: a reduced credit score, the inability to refinance credit, reputational damage, embarrassment, humiliation, and other emotional distress.

111.    FCO's violations were willful, rendering it liable for punitive damages under 15 U.S.C. § 1681n.  In the alternative, FCO was negligent, entitling Ms. Begum to recover against it under 15 U.S.C. § 1681o.

112.    Ms. Begum is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from FCO under 15 U.S.C. §§ 1681n and 1681o.

WHEREFORE, Plaintiff demands judgment for actual, statutory, and punitive damages against Defendant; her attorneys' fees and costs; pre- and post-judgment interest at the legal rate; and such other relief the Court considers proper.

**TRIAL BY JURY IS DEMANDED.**


Respectfully submitted,
**PLAINTIFF**

By: _____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170

18

Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
Matthew G. Rosendahl, VSB #93738
**KELLY GUZZO, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
Email: matt@kellyguzzo.com

*Counsel for Plaintiff*